Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Tel: (617) 485-0018
Fax: (508) 318-8100
anthony@paronichlaw.com

*Attorneys for Plaintiff,*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| CHET MICHAEL WILSON, individually and on behalf of a class of all persons and entities similarly situated,<br><br>　　　　Plaintiff<br><br>vs.<br><br>MAH Group, Inc.<br><br>　　　　Defendant. | Case No. 6:25-cv-00855-MTK<br><br>REPLY IN SUPPORT OF MOTION FOR ATTORNEY'S FEES AND OTHER SANCTIONS<br>TCPA (47 U.S.C. § 227) |

**REPLY IN SUPPORT OF MOTION
FOR ATTORNEY'S FEES AND OTHER SANCTIONS**

Defendant's opposition is an attempt to distract from what matters here: Defendant's *continued* failure to comply with this Court's December 17, 2025 Order compelling discovery and inviting a motion to seek mandatory fee-shifting under Rule 37, as complete records have still not been produced to this day. Defendant tries to paint Plaintiff's motion as a "gotcha." The record and the Defendant's litigation track record in federal court, including where it was sanctioned for $11,400 under Rule 37 in another court just last month, says the opposite. This Court found that after Plaintiff served discovery on July 3, 2025, "Defendant requested, and Plaintiff accommodated, at least seven extensions." Plaintiff continued to do so, but now enough is enough. What's more, Defendant's opposition uses side issues to distract from its conduct and continued failure to produce documents responsive to the discovery requests that the Court has already held must be compelled. Plaintiff's motion should not only be granted, but it should also continue to be enforced under the Plaintiff's proposed recurring sanctions until Defendant makes, minimally, a complete production of class calling records. Defendant's new attempt to posture (which the Plaintiff also addresses below) does not erase the history that compelled judicial intervention, nor does it defeat the mandatory fee-shifting under Rule 37.

## SUPPLEMENTAL PROCEDURAL HISTORY

From the inception of discovery, Plaintiff's counsel demonstrated reasonableness and good faith. Defendant's predecessor counsel, Anthony Cartee, explicitly acknowledged this in emailed correspondence attached herein as Exhibit A, observing that "Plaintiff has provided me the extensions, and I have appreciated and am grateful for them." On December 22, 2025, Andrew Harris, local counsel for WOLFPak, sent to Michael Henderson, WolfPak's CEO, via email and postal mail, a letter in compliance with the Court's December 18 order granting his motion to withdraw and directing him to notify the client of the Order. On December 30, 2025,

Reply Supp. Mot. Sanctions                1

counsel for Plaintiff received an email from Mr. Henderson at that same e-mail address, purportedly containing "responses" to the discovery that the Court compelled, which are attached herein as Exhibit B. Not only are these AI-generated "responses" patently frivolous, reasserting "objections" that the Court already overruled, they are also (1) rife with AI hallucinations to requests that were never propounded, (2) captioned with the wrong case name, and were (3) purportedly signed by Mr. Cartee after the Defendant claims to have heard from him.

Despite these deficiencies, when Defendant secured the instant substitute counsel, Plaintiff's counsel extended the same courtesy and cooperation to them as to Mr. Cartee when he first appeared, based in part on counsel's representation that they were willing to work collaboratively and to address the client's alleged outstanding issues. Unfortunately, these representations proved illusory. Despite again extending the time for Defendant to complete discovery responses and make complete production of the compelled documents, as well as offering to settle the monetary sanctions motion, Defendant has not produced the bulk of the data that the Court ordered produced dating from May 19, 2021, including aggregate calling data reflecting calls to Plaintiff. As Plaintiff's expert report, attached herein as Exhibit C, observes, Defendant still appears not to have produced the bulk of the calling data that this Court compelled, and has not even produced aggregate data reflecting *any* calls to the Plaintiff until *August 20, 2025*, more than *three months* after the inception of the litigation. What little data Defendant provided demonstrates that the Plaintiff has continued to receive calls, *at least 62 in total, more than three months after the initiation, and during the pendency of, this litigation.*

### ARGUMENT

1. **Defendant continues to fail to produce the compelled documents, despite calling the Plaintiff 62 times from three months *into this litigation to present*. Continued sanctions for noncompliance and payment for the motion briefing are warranted.**

Even if Defendant could shift blame to former counsel for some period (it cannot), sanctions are warranted because Defendant still has not finished producing what the Court ordered. Continued sanctions are appropriate until Defendant fully complies with the order. Plaintiff's counsel provided an extension until January 30 to make a complete production of the calling records the Court compelled. But Defendant still has not produced the court-ordered Yotpo records. On February 12, 2026, defense counsel conceded: "I see now that the full universe of records requested has not yet been produced. My client is working with Yotpo to get those records as soon as possible." (Exhibit D). By its own admission, Defendant acknowledges incomplete compliance. Indeed, it was not until February 12, 2026, that same day, that Defendant for the *first time* even *requested* all of the text logs from Yotpo. *Id.* This underscores a lack of diligence and demonstrates continued sanctions are appropriate, since Defendant only first asked for the complete records from Yotpo nearly two weeks *after* the Defendant's extended compliance deadline of January 30, to say nothing of the original deadline. Defendant cannot claim "substantial justification" where it did not request the very records the Court ordered.

Plaintiff's expert declaration, attached herein as Exhibit C, confirms the deficiencies in the aggregate dataset the Defendant has produced, as well. Notably, Defendant's own production is *missing calls to the Plaintiff prior to August 20, 2025*, more than three months *after* the date of the Complaint, despite Defendant producing a PDF, with respect to the Plaintiff only, reflecting calls as far back as January 1, 2025. Indeed, the bulk of the data, 6,582,748 of the 7,025,306 calling records produced, are dated *after the date of the Complaint.* This in and of itself demonstrates the staggering, widespread nature of the calling conduct, even after litigation. The fact that Defendant still has not produced aggregate data reflecting a *single call* to Plaintiff prior to August 20, 2025, yet persists in its illegal conduct in sending millions of text message calls to

Reply Supp. Mot. Sanctions                                3

class members, is a testament to how deficient Defendant's production remains, with Defendant either unable or unwilling to produce aggregate data reflecting even all the calls it admits it sent to the named Plaintiff both prior to and as long as three months into the pendency of this action.

These deficiencies underscore the need for immediate production of complete, class-wide calling data that the Court ordered, of potentially millions more calls. The data partially produced thus far does not allow the Plaintiff to make a meaningful evaluation of the scope or size of the already large class reliably. But even setting aside the deficiencies, it confirms that Defendant has continued to text persons, including the Plaintiff, for *months* after this litigation commenced, despite requesting that such messages stop, including by filing this lawsuit. As will be explained below, that makes Defendant's rhetoric about the propriety of this action especially inappropriate as a substitute for complete compliance with the Court's order. It also shows why the imposition of continuing sanctions of $300 a day are warranted until Defendant fully complies and provides *all* calling records (including those records reflecting calls to Plaintiff it admits it placed but cannot produce in the aggregate) from four years prior to the filing of this action to present.

Finally, the fees incurred in drafting Plaintiff's motion, and this reply, are recoverable under Rule 37, which has no safe harbor, as Defendant insinuates. *E.g.*, *Margolis v. Ryan*, 140 F.3d 850, 854 (9th Cir. 1998) (holding costs in drafting Rule 11 motion are recoverable as part of sanction); *Harris v. JFC Int'l Inc.*, No. 21-CV-01536-LK, 2023 WL 3818463, at *15 (W.D. Wash. June 5, 2023) (holding a district court may award fees attributable to drafting a motion for Rule 37 sanctions); *Sure Safe Indus. Inc. v. C & R Pier Mfg.*, 152 F.R.D. 625, 627 (S.D. Cal. 1993) (same). As the attached Declaration of Anthony Paronich explains, an additional eight hours was spent on this reply, warranting an additional $6,000 in sanctions under Rule 37.

2. **Defendant had knowledge of its discovery obligations.**

Yet another problem with Defendant's opposition is that it asks the Court to excuse the disobedient party on the theory that "prior counsel … abandoned Defendant" and the client "was in the dark" about its discovery obligations. As such, Defendant argues that fees should be denied as "unjust," or, alternatively, only award them against Mr. Cartee. Neither request fits Rule 37 on this record. As explained above, that theory fails to acknowledge Defendant's continued nonproduction. But even putting those issues aside, the record here not only shows that the Defendant shirked its discovery obligations, despite multiple good faith extensions provided to Mr. Cartee, but also went so far as to appear to itself *forge former counsel's signature* on discovery responses its owner served to Plaintiff on December 30, 2025. Moreover, all this occurred in the context of *repeatedly* extended deadlines, in which Mr. Cartee conceded the delays and thanked Plaintiff for the "extensions." These emails were sent *after* the claimed October 15, 2025 date on which Mr. Henderson allegedly heard from Mr. Cartee, including an October 22, 2025 email from Mr. Cartee promising production that never happened. (Exhibit E).

What's more, this timeline does not make sense. Mr. Henderson has submitted a sworn declaration stating that he has "not heard from attorney Anthony Cartee since October 15, 2025." (ECF No. 32 ¶ 2). Notwithstanding that Mr. Cartee emailed Plaintiff's counsel after then, Defendant itself sent the discovery responses attached herein as Exhibit B on December 30, 2025 bearing Mr. Cartee's signature block. Either Defendant was *not* supposedly "abandoned" and "in the dark" when it served the discovery requests purportedly "signed" by Mr. Cartee on October 17, 2025, or (more likely) it panicked when it saw counsel's December 30th email, asked an AI to generate responses to comply with the Court's October 17 deadline, (which the AI hallucinated and generated for the wrong case while asserting nonsensical and overruled

responses to discovery that was not even asked), and then forged Mr. Cartee's signature to those responses, and sent them in a reply that same December 30, not more than 18 minutes later.

Notably, Plaintiff raised this issue immediately and repeatedly. On January 3, 2026, Plaintiff's counsel flagged "the curious production of discovery documents allegedly signed by Mr. Cartee but served upon us by Mr. Henderson." (Exhibit B). And on January 16, 2026, Plaintiff again requested an explanation from Defendant's new counsel: "we also wish to discuss the source of the attached that we received directly from your client and purportedly signed by their former attorney." (Exhibit F). Defendant and its counsel still have provided no explanation. Defendant's failure to respond proves that Defendant knew exactly what it was doing and knew it was wrong. Even so, Defendant still has not complied with its discovery obligations.

Courts impose Rule 37 fees sanctions precisely to deter repeat noncompliance and ensure discovery orders mean something. Defendant cannot claim that sanctions would work some injustice when it has already been sanctioned in another Court for nearly identical conduct. Last month, the Central District of California granted a motion for Rule 37 sanctions, which the Defendant did not even bother to oppose, and ordered: "Defendant shall pay … $11,400[1] as Plaintiff's reasonable expenses in preparing and filing the Motion to Compel …." (Exhibit G). Whatever disputes Defendant may have with Mr. Cartee, they do not erase Defendant's discovery obligations, as Defendant already knows from its other litigation.

Even so, the Supreme Court has squarely rejected the notion that consequences of

---

[1] That motion sought 19 hours of attorney time at $600 an hour. That is similar to the 10 hours spent in the motion itself (and an additional eight in the reply) here at $750 an hour, considering the experience of counsel and specialized nature of the practice area, as well as previous awards. This amount also is slightly above, but still around the 95th percentile, for hourly billing rates for similar experience level and practice areas in Oregon and Downtown Portland based on the 2022 Economic Survey.

Reply Supp. Mot. Sanctions                6

counsel's failures are "unjust" to clients for the purposes of determining whether clients should incur discovery sanctions. *Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988) (rejecting the notion that exclusion sanction for discovery abuse violated the due process clause and observing that "the argument that the client should not be held responsible for his lawyer's misconduct strikes at the heart of the attorney-client relationship. . . . In responding to discovery, the client has a duty to be candid and forthcoming with the lawyer, and when the lawyer responds, he or she speaks for the client."). Defendant's own record creates a client conduct problem the Court cannot ignore and that appropriately justifies sanctions both against Mr. Cartee, MAH Group, and its current attorneys, including on account of continued nonproduction.

3. **Defendant's purported consent arguments are irrelevant and self-defeating because Defendant continues to call Plaintiff absent any putative consent and their underlying "consent" was legally deficient.**

Cognizant of the fact that the Plaintiff has demonstrated that Defendant's position was, and remains, substantially unjustified, Defendant tries to flip the narrative by manufacturing a purported dispute about the Plaintiff's IP address and consent. As an initial matter, Rule 37 sanctions are presumptively *mandatory*. *Infanzon v. Allstate Ins. Co.*, 335 F.R.D. 305, 311 (C.D. Cal. 2020), *aff'd*, No. 22-56070, 2024 WL 3631140 (9th Cir. Aug. 2, 2024). What's more, merits defenses are not defenses to Rule 37 sanctions. *Id.* at 312 ("That Allstate later happened to prevail on its motion to dismiss, potentially mooting some of the discovery requests cannot—after the fact—justify Plaintiff's deficient responses at the time. It may mitigate the overriding prejudice to Allstate, but it does not erase the stain of the discovery abuse in the first place."); *see Dr. Erik Natkin, D.O. P.C. v. Am. Osteopathic Ass'n*, No. 3:16-CV-1494-SI, 2024 WL 4873508, at *2 (D. Or. Apr. 19, 2024) (distinguishing between sanctions motions and dispositive motions).

Given the seriousness of the allegations levied against Plaintiff and his counsel, they desire to set the record straight. Defendant appears to have obtained the Plaintiff's IP address[2] from various links on which he clicked on after this litigation was initiated. Indeed, Defendant's own logs, produced as MAH00018 through MAH000226, show that the IP address alleged *first* appeared in the Defendant's own records only on August 22, 2025, *after* this litigation was commenced. The Plaintiff does not dispute that he clicked various of the text message links at various points to see where they went and to identify the caller, including during the pendency of this litigation, owing to Defendant's continued calling conduct. But that does not prove the Plaintiff signed up at all as an initial matter, nor does it establish consent to future communications. *Bradley v. DentalPlans.com*, No. CV 20-1094-BAH, 2024 WL 2865075, at *9 (D. Md. June 6, 2024) (holding that agreement to be transferred to a sales representative during a call was insufficient evidence that the plaintiff intended to agree to future calls).

Critically, Defendant has not produced any admissible record evidence substantiating from what IP address the sign up purportedly originated from, a sign up which contains the name "Taken Rosins" and the email address "no@gmail.com," and thus bears significant indicia of unreliability insufficient to establish TCPA-specific consent. *See Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 984 (N.D. Cal. 2019) (holding no consent was obtained when purported consent data bore indicia of unreliability, including names like "blah blah" and "[BLANK]," and other "nonsense characters," and further holding that such "erroneous entries" could not be "considered valid registrations of the associated telephone numbers."). The

---

[2] Plaintiff acknowledges that his email initially denied that the IP address was his. This incorrect statement was due to a technical misunderstanding of IP addresses, which have two varieties, IPv6 and IPv4. Plaintiff's counsel was reviewing the Plaintiff's IPv6 address, which does not match, when the address provided was an IPv4 address, which does match.

Reply Supp. Mot. Sanctions                    8

information allegedly submitted here is not Plaintiff's information. Defendant's refusal to produce complete consent records that the Court already compelled, while simultaneously demanding withdrawal based on a disputed IP address, is backwards. The proper remedy is full compliance with the discovery order, including as to all putative consent information so that it can be evaluated for more inconsistencies of this ilk, not an attempt to litigate consent, on which Defendant has the burden of proving, via insinuation in a sanctions opposition.

What's most remarkable about Defendant's distraction from its undisputed lack of compliance with the Court's Order on the basis that it believes it had consent to contact Plaintiff is the *fact that it has sent him dozens of text messages* since the Plaintiff filed this lawsuit based on the receipt of unwanted text messages. Indeed, Defendant sent at least 62 text message calls to Plaintiff *during the pendency of this litigation*, its records of which start *three months after* the Plaintiff initiated the litigation, thereby revoking any purported consent. Even assuming, *arguendo*, that the Plaintiff did sign up to receive text message calls from the Defendant, which is disputed, Defendant has not established adequate consent to justify dismissal, let alone its bellicose rhetoric. Defendant's position ignores the *62 messages* it delivered to the Plaintiff more than *three months into the pendency of this litigation*. There is no excuse for, and no consent attendant to, continuing to send text message calls to the Plaintiff, since filing and serving litigation is sufficient to revoke consent. *See Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 394 (D. Mass. 2024) ("Though his number was not in QuoteWizard's DNC files, that is because he expressed his desire for the texts to cease by suing, rather than texting back."); *McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2018 WL 692105, at *6 (N.D. Cal. Feb. 2, 2018) ("the service of plaintiffs' complaint effectively revoked consent to be called").

Reply Supp. Mot. Sanctions                               9

But even *if* this Court were to hold that the plaintiff did sign up (which is disputed), and even *if* this Court were to ignore Defendant's continued conduct in sending text message calls to Plaintiff after he indicated he did not want to receive them, including by filing this litigation (which it should not), the very consent language is deficient as a matter of law. As an initial matter, the purported consent language includes links to the "Privacy Policy & ToS" is a dark black font on a dark black background, and the hyperlink is highlighted in dark blue, which is insufficient to provide notice as to all the attendant terms. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 858 (9th Cir. 2022). And, the Defendants in *Bradley* and *Mantha* lost at summary judgment because their purported consent forms did not comply with various of the requirements of the Federal ESIGN Act, including providing the opportunity to provide their consent to sign and receive documents electronically, 15 U.S.C. § 7001(c)(1)(C)(i), (ii), or giving any consumer a "statement" informing them of the procedures for granting or withdrawing consent, together with *any* of the other required consumer disclosures, including the very consent to electronic records themselves. 15 U.S.C. § 7001(c), (c)(1). *Bradley*, 2024 WL 2865075, at *7; *Mantha*, 2021 WL 6061919, at *8. So, even if the Defendant ultimately prevails in demonstrating that the Plaintiff had consented at some point (which is itself a merits dispute), courts recognize both that uniform issues with the consent evidence may render it insufficient, as in *Berman*, or that consent can be revoked by filing suit, as in *Mantha*. Regardless, this is another dispute for another day and is simply a distraction from Rule 37's mandatory sanctions.

## CONCLUSION

For the foregoing reasons, the Court should grant the instant motion and issue the requested sanctions of $300 per day plus an additional $6,000 for this Reply.

Dated: March 6, 2026

/s/ *Anthony I. Paronich*
Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Tel: (617) 485-0018
Fax: (508) 318-8100
anthony@paronichlaw.com

*Counsel for Plaintiff and the proposed class*