

Get a demo

# Data Processing Addendum

**Updated February 2026**

This Data Processing Addendum (“**DPA**”) is incorporated by reference into Yotpo’s Terms of Service available at https://www.yotpo.com/terms-of-service/ or other agreement governing the use of Yotpo’s services (“**Agreement**”) entered by and between you, the Client (as defined in the Agreement) (collectively, “**you**”, “**your**”, “**Client**”), and Yotpo Ltd. or an Affiliate (“**Yotpo**”, “**us**”, “**we**”, “**our**”) to reflect the parties’ agreement with regard to the Processing of Personal Data by Yotpo solely on behalf of the Client. Both parties shall be referred to as the “**Parties**” and each, a “**Party**”.

Capitalized terms not defined herein shall have the meanings assigned to such terms in the Agreement.

By using the Services, Client accepts this DPA and you represent and warrant that you have full authority to bind the Client to this DPA. If you cannot, or do not agree to, comply with and be bound by this DPA, or do not have authority to bind the Client or any other entity, please do not provide Personal Data to us.

In the event of any conflict between certain provisions of this DPA and the provisions of the Agreement, the provisions of this DPA shall prevail over the conflicting provisions of the Agreement solely with respect to the Processing of Personal Data.

## 1. DEFINITIONS

(a) “**Affiliate**” means any entity that directly or indirectly controls, is controlled by, or is under common control with the subject entity. “Control”, for purposes of this definition, means direct or indirect ownership or control of more than 50% of the voting interests of the subject entity.

(b) “**Authorized Affiliate**” means any of Client’s Affiliate(s) which is explicitly permitted to use the Service pursuant to the Agreement between Client and Yotpo but has not signed its own agreement with Yotpo and is not a “Client” as defined under the Agreement.

(c) “**CCPA**” means the California Consumer Privacy Act of 2018, Cal. Civ. Code §§ 1798.100 et seq., and its implementing regulations, including as amended by the California Privacy Rights

Act.

(d) The terms, "**Controller**", "**Data Subject**", "**Member State**", "**Processor**", "**Processing**" and "**Supervisory Authority**" shall have the same meaning as in the GDPR. The terms "**Business**", "**Business Purpose**", "**Consumer**" and "**Service Provider**" shall have the same meaning as in the CCPA.

For the purpose of clarity, within this DPA "**Controller**" shall also mean "**Business**", and "**Processor**" shall also mean "**Service Provider**", to the extent that the CCPA/CPRA applies. In the same manner, Processor's Sub-processor shall also refer to the concept of Service Provider.

(e) "**Data Protection Laws**" means all applicable and binding privacy and data protection laws and regulations, including such laws and regulations of the European Union, the European Economic Area and their Member States, Switzerland, the United Kingdom, Canada, Israel and the United States of America, as applicable to the Processing of Personal Data under the Agreement including (without limitation) the GDPR, the UK GDPR, the FADP, the CCPA, the Virginia Consumer Data Privacy Act, the Colorado Privacy Act and similar comprehensive privacy laws of other US states, in each case as known or reasonably expected by Yotpo to be applicable to the Processing of Personal Data hereunder and in effect at the time of Processor's performance hereunder.

(f) "**Data Subject**" means the identified or identifiable person to whom the Personal Data relates.

(g) "**FADP**" means the Federal Act on Data Protection of 19 June 1992.

(h) "**GDPR**" means the Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC (General Data Protection Regulation).

(i) "**Ocean**" means Ocean Ecom Inc., a subsidiary of Yotpo that offers the Ocean subscription shopping service ("**Ocean Services**").

(j) "**Personal Data**" means any information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, to or with an identified or identifiable natural person or Consumer, to the extent such information is processed by Yotpo solely on behalf of Client, under this DPA and the Agreement between Client and Yotpo. "Personal Data" does not include any information that Yotpo receives about Data Subjects (i) for purposes of Yotpo or Ocean providing products or services directly to the Data Subject and/or (ii) as a result of the Data Subject's instructions to, or direct relationship or intentional interaction with, Yotpo or Ocean.

(k) "**Services**" means the services provided to Client by Processor in accordance with the

Agreement.

(l) "**Security Measures**" means the security measures applicable to the Services purchased by Client, as updated from time to time, and accessible via https://www.yotpo.com/Security-Measures/ or as otherwise made reasonably available by Yotpo.

(m) "**Sensitive Data**" means Personal Data that is protected under a special legislation and requires unique treatment, such as "special categories of data", "sensitive data" or other materially similar terms under applicable Data Protection Laws.

(n) "**Standard Contractual Clauses**" shall mean (i) the standard contractual clauses set out in the Annex of Commission Implementing Decision (EU) 2021/914 of 4 June 2021 ("EU SCCs"); or (ii) where the UK GDPR applies, the International Data Transfer Addendum to the EU SCCs issued by the Information Commissioner's Office in the UK, as applicable in the form currently located at https://www.yotpo.com/standard-contractual-clauses/.

(o) "**Sub-processor**" means any third party that Processes Personal Data under the instruction or supervision of Yotpo.

(p) "**UK GDPR**" means the Data Protection Act 2018, as well as the GDPR as it forms part of the law of England and Wales, Scotland and Northern Ireland by virtue of section 3 of the European Union (Withdrawal) Act 2018 and as amended by the Data Protection, Privacy and Electronic Communications (Amendments etc.) (EU Exit) Regulations 2019 (SI 2019/419).

## 2. PROCESSING OF PERSONAL DATA

2.1 **Roles of the Parties**. The Parties acknowledge and agree that with regard to the Processing of Personal Data performed solely on behalf of Client, (i) Client is the Controller of Personal Data, and (ii) Yotpo is the Processor of such Personal Data. The terms "Controller" and "Processor" below hereby signify Client and Yotpo, respectively.

2.2 **Client's Processing of Personal Data**. Client, in its use of the Service, and Client's instructions to the Processor, shall comply with Data Protection Laws. Client shall establish and have any and all required legal bases in order to collect, Process and transfer to Processor the Personal Data, and to authorize the Processing by Processor, and for Processor's Processing activities on Client's behalf, including the pursuit of 'business purposes' as defined under the CCPA.

2.3 **Processor's Processing of Personal Data**. When Processing on Client's behalf under the Agreement, Processor shall Process Personal Data for the following purposes: (i) Processing in accordance with the Agreement and this DPA; (ii) Processing for Client as part of its provision of the Services or to facilitate Client's participation in the Ocean Services or the Ask Ben add-on; (iii) Processing to comply with Client's reasonable and documented instructions, where such instructions are consistent with the terms of the Agreement, regarding the manner in which the Processing shall be performed; (iv) where instructed by Client, Processing to analyze Client Content in order to identify Client's Top Reviewers (as defined in

the Terms of Service) and to contact such End-Users on Client's behalf to facilitate additional Reviews or articles for the benefit of Client; (v) rendering Personal Data fully anonymous, non-identifiable and non-personal in accordance with applicable standards recognized by Data Protection Laws and guidance issued thereunder; (vi) Processing as required under the laws applicable to Processor, and/or as required by a court of competent jurisdiction or other competent governmental or semi-governmental authority, provided that Processor shall inform Client of the legal requirement before Processing, unless such law or order prohibit such information on important grounds of public interest.

Processor shall inform Client without undue delay if, in Processor's opinion, an instruction for the Processing of Personal Data given by Client infringes applicable Data Protection Laws. To the extent that Processor cannot comply with an instruction from Client, Processor (i) shall inform Client, providing relevant details of the issue, (ii) Processor may, without liability to Client, temporarily cease all Processing of the affected Personal Data (other than securely storing such data) and/or suspend Client's access to the Services, and (iii) if the Parties do not agree on a resolution to the issue in question and the costs thereof, Client may, as its sole remedy, terminate the Agreement and this DPA with respect to the affected Processing, and Client shall pay to Processor all the amounts owed to Processor or due before the date of termination. Client will have no further claims against Processor (including, without limitation, requesting refunds for Service) pursuant to the termination of the Agreement and the DPA as described in this paragraph.

2.4 **Details of the Processing**. The subject-matter of Processing of Personal Data by Processor is the performance of the Service pursuant to the Agreement. The duration of the Processing, the nature and purpose of the Processing, the types of Personal Data and categories of Data Subjects Processed under this DPA are further specified in Schedule 1 (Details of Processing) to this DPA.

2.5 **Sensitive Data**. The Parties agree that the Services are not intended for the processing of Sensitive Data, and that if Client wishes to use the Services to process Sensitive Data, it must first obtain the Processor's explicit prior written consent and enter into any additional agreements as required by Yotpo.

2.6 **CCPA Personal Data**. This section 2.6 applies to Personal Data subject to the CCPA. Processor shall not, without Client's prior written consent or instruction or unless otherwise permitted by the CCPA, (i) combine the Personal Data Processed on Client's behalf with any information it processes on behalf of or receives from any other parties, by way of logical separation, (ii) process the Personal Data outside the direct business relationship between Processor and Client, or (iii) sell or share (as such terms are defined in the CCPA) Personal Data. Processor shall use and disclose Personal Data solely for the purposes for which such Personal Data was provided to it, as stipulated in the Agreement and this DPA, and shall provide the same level of privacy protection as required by the CCPA in relation to such Personal Data. Processor shall notify Client without undue delay if Processor makes a determination that it can no longer meet its obligations under the CCPA. To the extent required

by the CCPA, and upon reasonable written notice that Client reasonably believes Processor is using Personal Data in violation of the CCPA or this DPA, Client shall have the right to take reasonable and appropriate steps to help ensure that Processor uses the Personal Data in a manner consistent with Client's obligations under the CCPA and stop and remediate any unauthorized use of the Personal Data.

## 3. DATA SUBJECT REQUESTS

Processor shall, to the extent legally permitted, notify Client or refer Data Subject or Consumer to Client, if Processor receives a request from a Data Subject or Consumer to exercise their rights (to the extent available to them under applicable Data Protection Laws), such as of access, rectification, restriction, erasure, data portability, objection to the Processing, not to be subject to automated individual decision making, to opt-out of the sale of Personal Data, or the right not to be discriminated against ("**Data Subject Request**"). Taking into account the nature of the Processing, Processor shall assist Client by implementing appropriate technical and organizational measures, insofar as this is possible and reasonable, for the fulfilment of Client's obligation to respond to a Data Subject Request under Data Protection Laws. Processor may advise Data Subjects on available features for self-exercising their Data Subject Requests through the Services (where appropriate), and/or refer Data Subject Requests received, and the Data Subjects making them, directly to the Client for its treatment of such requests.

## 4. CONFIDENTIALITY

Processor shall ensure that its personnel and advisors engaged in the Processing of Personal Data have committed themselves to confidentiality.

## 5. SUB-PROCESSORS

5.1 **Appointment of Sub-processors**. Client acknowledges and agrees that (a) Processor's Affiliates may be engaged as Sub-processors; and (b) Processor and Processor's Affiliates on behalf of Processor may each engage third-party Sub-processors in connection with the provision of the Service.

5.2 **List of Current Sub-processors and Notification of New Sub-processors**.

5.2.1 Processor makes available to Client the current list of Sub-Processors used by Processor to process Personal Data via https://www.yotpo.com/subprocessors/. Such Sub-processor list includes the identities of those Sub-processors and the entity's country ("**Sub-Processor List**"). The Sub-Processor List as of the date of first use of the Service by Client is hereby deemed authorized upon first use of the Services. Client will have no further claims against Processor due to (i) past use of approved Sub-processors prior to the date of the first use of the Services or (ii) the termination of the Agreement (including, without limitation, requesting refunds) and the DPA in the situation described in this paragraph.

5.2.2 Processor's webpage, accessible via www.yotpo.com/subprocessors, offers a mechanism to subscribe to notifications of new Sub-processors used to Process Personal Data, to which Client shall subscribe, and when Client subscribes, Processor shall provide notification of any new Sub-processor(s) before authorizing such new Sub-processor(s) to Process Personal Data in connection with the provision of the Services.

5.3 **Objection to New Sub-processors**. Client may reasonably object to Processor's use of a new Sub-processor, for reasons relating to the protection of Personal Data intended to be Processed by such Sub-processor, by notifying Processor promptly in writing within seven (7) days after receipt of a Processor notification in accordance with the mechanism set out in Section 5.2.2. Such written objection shall include the reasons for objecting to Processor's use of such new Sub-processor. Failure to object to such new Sub-processor in writing within seven (7) days following Processor's notice shall be deemed as acceptance of the new Sub-Processor. In the event Client reasonably objects to a new Sub-processor, as permitted in the preceding sentences, Processor will use reasonable efforts to make available to Client a change in the Service or recommend a commercially reasonable change to Client's configuration or use of the Service to avoid Processing of Personal Data by the objected-to new Sub-processor without unreasonably burdening the Client. If Processor is unable to make available such change within thirty (30) days, Client may, as a sole remedy, terminate the applicable Agreement and this DPA with respect only to those Services which cannot be provided by Processor without the use of the objected-to new Sub-processor, by providing written notice to Processor. All amounts due under the Agreement before the termination date with respect to the Processing at issue shall be duly paid to Processor. Until a decision is made regarding the new Sub-processor, Processor may temporarily suspend the Processing of the affected Personal Data and/or suspend access to the Services. Client will have no further claims against Processor due to the termination of the Agreement (including, without limitation, requesting refunds) and/or the DPA in the situation described in this paragraph.

5.4 **Agreements with Sub-processors**. Processor or a Processor's Affiliate on behalf of Processor has entered into a written agreement with each Sub-processor containing appropriate safeguards to the protection of Personal Data. Where Processor engages a Sub-processor for carrying out specific Processing activities on behalf of the Client, the same or materially similar data protection obligations as set out in this DPA shall be imposed on such new Sub-processor by way of a contract, in particular obligations to implement appropriate technical and organizational measures in such a manner that the processing will meet the requirements of the GDPR. Where a Sub-processor fails to fulfil its data protection obligations concerning its processing of Personal Data, Processor shall remain responsible for the performance of the Sub-processor's obligations.

## 6. SECURITY & AUDITS

6.1 **Controls for the Protection of Personal Data**. Processor shall maintain industry-standard technical and organizational measures for protection of Personal Data Processed hereunder (including protection against unauthorized or unlawful Processing and against accidental or

unlawful destruction, loss or alteration or damage, unauthorized disclosure of, or access to, Personal Data, confidentiality and integrity of Personal Data, including those measures set forth in the Security Measures), as may be amended from time to time. Upon the Client's reasonable request, Processor will reasonably assist Client, at Client's cost and subject to the provisions of Section 11.1 below, in ensuring compliance with the obligations pursuant to Articles 32 to 36 of the GDPR taking into account the nature of the processing and the information available to Processor.

6.2 **Audits and Inspections**. Upon Client's 14 days prior written request at reasonable intervals (no more than once every 12 months), and subject to strict confidentiality undertakings by Client, Processor shall make available to Client that is not a competitor of Processor (or Client's independent, reputable, third-party auditor that is not a competitor of Processor and not in conflict with Processor, subject to their confidentiality and non-compete undertakings) information necessary to demonstrate compliance with this DPA, and allow for and contribute to audits, including inspections, conducted by them (provided, however, that such information, audits, inspections and the results therefrom, including the documents reflecting the outcome of the audit and/or the inspections, shall only be used by Client to assess compliance with this DPA, and shall not be used for any other purpose or disclosed to any third party without Processor's prior written approval. Upon Processor's first request, Client shall return all records or documentation in Client's possession or control provided by Processor in the context of the audit and/or the inspection).

6.3 In the event of an audit or inspections as set forth above, Client shall ensure that it (and each of its mandated auditors) will not cause (or, if it cannot avoid, minimize) any damage, injury or disruption to Processor's premises, equipment, personnel and business while conducting such audit or inspection.

6.4 The audit rights set forth in 6.2 above shall only apply to the extent that the Agreement does not otherwise provide Client with audit rights that meet the relevant requirements of Data Protection Laws (including, where applicable, Article 28(3)(h) of the GDPR or the UK GDPR).

## 7. DATA INCIDENT MANAGEMENT AND NOTIFICATION

Processor maintains security incident management policies and procedures and, to the extent required under applicable Data Protection Laws, shall notify Client without undue delay after becoming aware of the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to Personal Data Processed by Processor on behalf of the Client (a "**Data Incident**"). Processor shall make reasonable efforts to identify and take those steps as Processor deems necessary and reasonable in order to remediate and/or mitigate the cause of such Data Incident to the extent the remediation and/or mitigation is within Processor's reasonable control. The obligations herein shall not apply to incidents that are caused by Client or anyone who uses the Services on Client's behalf. Client will not make, disclose, release or publish any finding, admission of liability, communication, notice, press release or report concerning any Data Incident which directly or indirectly identifies Processor (including

in any legal proceeding or in any notification to regulatory or supervisory authorities or affected individuals) without Processor's prior written approval, unless, and solely to the extent that, Client is compelled to do so pursuant to applicable Data Protection Laws. In the latter case, unless prohibited by such laws, Client shall provide Processor with reasonable prior written notice to provide Processor with the opportunity to object to such disclosure and in any case, Client will limit the disclosure to the minimum scope required.

## 8. RETURN AND DELETION OF PERSONAL DATA

Following termination of the Agreement and subject thereto, Processor shall, at the choice of Client (indicated through the Service or in written notification to Processor), delete or return to Client all the Personal Data it Processes solely on behalf of the Client, and Processor shall delete existing copies of such Personal Data unless Data Protection Laws require otherwise. To the extent authorized or required by applicable law, Processor may also retain one copy of the Personal Data solely for evidence purposes and/or for the establishment, exercise or defense of legal claims and/or for compliance with legal obligations.

## 9. CROSS-BORDER DATA TRANSFERS

9.1 **Transfers from the EEA, the United Kingdom and Switzerland to countries that offer adequate level of data protection**. Personal Data may be transferred from EU Member States, the three other EEA member countries (Norway, Liechtenstein and Iceland) (collectively, "**EEA**"), the United Kingdom ("**UK**") and Switzerland to countries that offer an adequate level of data protection under or pursuant to the adequacy decisions published by the relevant data protection authorities of the EEA, the European Union, the Member States or the European Commission, the UK, and/or Switzerland ("**Adequacy Decisions**"), as applicable, without any further safeguard being necessary.

9.2 **Transfers from the EEA, the United Kingdom and Switzerland to other countries**. If the Processing of Personal Data by Processor includes a transfer (either directly or via onward transfer) from the EEA ("**EEA Transfer**"), the UK ("**UK Transfer**"), and/or Switzerland ("**Swiss Transfer**") to other countries which have not been subject to a relevant Adequacy Decision, and such transfers are not performed through an alternative recognized compliance mechanism as may be adopted by Processor for the lawful transfer of personal data (as defined in the GDPR, the UK GDPR, the FADP, as relevant) outside the EEA, the UK or Switzerland, as applicable, then (i) the terms set forth in the Standard Contractual Clauses (EEA Cross Border Transfers) shall apply to any such EEA Transfer; (ii) the terms set forth in Annex III (UK Cross Border Transfers) shall apply to any such UK Transfer ("**UK Addendum**"); (iii) the terms set forth in Annex IV (Swiss Cross Border Transfers) shall apply to any such Swiss Transfer; and (iv) the terms set forth in Annex V (Additional Safeguards) shall apply to any such transfers.

## 10. AUTHORIZED AFFILIATES

10.1 **Contractual Relationship**. The Parties acknowledge and agree that, by executing the DPA, the Client enters into the DPA on behalf of itself and, as applicable, in the name and on behalf of its Authorized Affiliates, in which case each Authorized Affiliate agrees to be bound by the Client's obligations under this DPA, if and to the extent that Processor Processes Personal Data on the behalf of such Authorized Affiliates, thus qualifying them as the "**Controller**". All access to and use of the Service by Authorized Affiliates must comply with the terms and conditions of the Agreement and this DPA and any violation of the terms and conditions therein by an Authorized Affiliate shall be deemed a violation by Client.

10.2 **Communication**. Client shall remain responsible for coordinating all communication with Processor under the Agreement and this DPA and shall be entitled to make and receive any communication in relation to this DPA on behalf of its Authorized Affiliates.

## 11. OTHER PROVISIONS

11.1 **Data Protection Impact Assessment and Prior Consultation**. Upon Client's reasonable request, Processor shall provide Client, at Client's cost, with reasonable cooperation and assistance needed to fulfil Client's obligation under the GDPR or the UK GDPR (as applicable) to carry out a data protection impact assessment related to Client's use of the Service, to the extent Client does not otherwise have access to the relevant information, and to the extent such information is available to Processor. Processor shall provide, at Client's cost, reasonable assistance to Client in the cooperation or prior consultation with the Supervisory Authority in the performance of its tasks relating to this Section 11.1, to the extent required under the GDPR or the UK GDPR, as applicable.

11.2 **Modifications**. Each Party may by at least forty-five (45) calendar days' prior written notice to the other Party, request in writing any variations to this DPA if they are required as a result of any change in, or decision of a competent authority under, any Data Protection Laws, to allow Processing of Client Personal Data to be made (or continue to be made) without breach of those Data Protection Laws. Pursuant to such notice: (a) The Parties shall make commercially reasonable efforts to accommodate such modification requested by Client or that Processor believes is necessary; and (b) Client shall not unreasonably withhold or delay agreement to any consequential variations to this DPA proposed by Processor to protect the Processor against additional risks, or to indemnify and compensate Processor for any further steps and costs associated with the variations made herein at Client's request. The Parties shall promptly discuss the proposed variations and negotiate in good faith with a view to agreeing and implementing those or alternative variations designed to address the requirements identified in Client's or Processor's notice as soon as is reasonably practicable. In the event that the Parties are unable to reach such an agreement within 30 days of such notice, then Client or Processor may, by written notice to the other Party, with immediate effect, terminate the Agreement to the extent that it relates to the Services which are affected by the proposed variations (or lack thereof). Client will have no further claims against Processor (including, without limitation, requesting refunds for the Services) pursuant to the termination of the Agreement and the DPA as described in this Section.

**SCHEDULE 1 – DETAILS OF THE PROCESSING**

**Nature and Purpose of Processing**

1. Providing the Services to Client;
2. Performing the Agreement, this DPA and/or other contracts executed by the Parties;
3. Acting upon Client's instructions, where such instructions are consistent with the terms of the Agreement;
4. Disclosing Personal Data (i) to third parties in accordance with Client's instructions and/or pursuant to Client's use of the Services (e.g., integrations between the Services and any services provided by third parties, as configured by or on behalf of Client to facilitate the disclosure of Personal Data between the Services and such third party services), and/or (ii) to facilitate Client's participation in, and its end users' use of, the Ocean Services.
5. Rendering Personal Data fully anonymous, non-identifiable and non-personal in accordance with applicable standards recognized by Data Protection Laws and guidance issued thereunder;
6. Complying with applicable laws and regulations;
7. All tasks related to any of the above.

**Duration of Processing**

Subject to any Section of the DPA and/or the Agreement dealing with the duration of the Processing and the consequences of the expiration or termination thereof, Processor will Process Personal Data pursuant to the DPA and Agreement for the duration of the Agreement, unless otherwise agreed upon in writing.

**Type of Personal Data**

The Personal Data processed may consist of name, email address, telephone number, email data, system usage data, location data (physical address, IP address), purchase information (e.g., details concerning products or services purchased and time of purchase, but excluding payment method details) and other electronic data submitted, stored, sent, or received by the Data Subjects.

**Categories of Data Subjects**

The Data Subjects are Client's end users and shoppers who purchase products and/or services from Client online, or submit a review via the onsite reviews widget that is installed on the Client's website.

## Products ⌄

Reviews & UGC

## Company ⌄

Loyalty & Referrals

About Yotpo

Discover **Early Access**

## Resources ⌄

Pricing

Careers

Product Releases Hub

## Tools ⌄

Blog

Request a Demo

Profit Margin Calculator

Media House

Customer Success

Barcode Generator

Insights

Reseller

Reviews Generator

eCommerce Glossary

## Compare ⌄

Agency Partner Program **NEW**

Loyalty Program Software

Bulk Sales Calculator

Yotpo vs Loyalty Lion

Photos Reviews App

Yotpo vs Okendo

Commission Board

Shopify Loyalty App

## Support ⌄

Contact Support

Yotpo vs Reviews

Affiliate program

All Solutions

Help Center

Yotpo vs BazaarVoice

commerceGPT newsletter **New**

Connect with an Agency

Yotpo vs Reviews.io

Accessibility Statement

Yotpo vs Rivo

API Documentation

API Changelog

Yotpo Status

FAQs



## Don't Miss Out On Revenue Growth

   

Inside CommerceGPT

The newsletter for eComm leaders navigating the shift to AI.

Business Email*

**Subscribe**

Terms of Service   Website Terms of Use   Security

Privacy Policy     Cookie Settings     Accessibility